## A11A0328. DOMINGUEZ v. THE STATE.
### (714 SE2d 25)

BLACKWELL, Judge.

Two deputies with the Hall County Sheriff's Office stopped a car driven by Leonel A. Dominguez after they observed Dominguez fail to properly signal a right turn. These deputies were following Dominguez because someone had told them that a Hispanic man who drove the same kind of car was a drug dealer. In the course of the traffic stop, the deputies asked Dominguez for permission to search his car. When he refused, the deputies called for a canine unit to come to the scene and detained Dominguez until the canine unit arrived. When the canine unit arrived about ten minutes later, a drug dog sniffed the exterior of the car and indicated the presence of drugs. The deputies then searched the car and found approximately three grams of methamphetamine in the steering column.

Before trial, Dominguez moved to suppress the evidence seized during the search of his car, contending that it resulted from an unlawful detention. Following a hearing on that motion, the trial court denied it. Dominguez then was tried without a jury and was convicted of possession of methamphetamine with intent to distribute in violation of OCGA § 16-13-30 (b) and failure to use his turn signal in violation of OCGA § 40-6-123 (a).[1] Dominguez appeals, asserting that the trial court erred when it denied his motion to suppress. We agree and reverse the judgment below.

With respect to the motion to suppress, the facts are undisputed.[2] The evidence shows that the deputies received a tip about a Hispanic drug dealer on either the day they stopped Dominguez or the day before. According to one deputy, the tipster told them that a Hispanic man, who was a large man and went by the name "Giant," drove a green Crown Victoria and dealt methamphetamine. The tipster gave the deputies no other information, such as the specific areas in which Giant sold drugs or when they might expect to see Giant in those areas. As one deputy acknowledged, the information was "very vague . . . even for us." Later, at the hearing on the motion to suppress, the deputies did not identify the tipster or explain how

---

[1] Different judges heard the motion to suppress and the bench trial.

[2] Because the facts are undisputed, we review the denial of the motion to suppress de novo. *Vansant v. State*, 264 Ga. 319, 320 (1) (443 SE2d 474) (1994).

they came into contact with him, but they admitted that the tipster was neither an informant who worked regularly with the Sheriff's Office nor someone who was known to the deputies. One deputy explained, "I can't even tell you why I began talking to [the tipster]."

When the deputies later saw Dominguez driving a green Crown Victoria, they began to follow him. They followed him for several miles and, during that time, asked their dispatcher to check the registration of the car.[3] When Dominguez made a right turn, the officers noticed that his turn signal was not operating properly, and they initiated a traffic stop.[4] According to one deputy, Dominguez appeared nervous when the deputies first approached him, and his hands were shaking when he gave his driver's license to them.

Dominguez told the deputies that he was unaware of any problem with his right turn signal, and they offered to show him that it was not working properly. Dominguez declined this offer, explaining that he believed what the deputies had told him. The deputies then instructed Dominguez to exit his car and walk to the rear of the car. Dominguez complied, and while he was standing at the rear of his car, one deputy commented that he seemed "kind of nervous" and asked whether Dominguez had any drugs or weapons on his person.[5] Dominguez responded that he did not have any drugs or weapons, and the deputies then asked him to empty his pockets. Dominguez did so, and he placed the items he removed from his pockets on the trunk of his car. The deputies then asked for permission to search his person, and Dominguez consented. The deputies found nothing of interest when they searched his person, one told Dominguez that he was "good to go," and Dominguez began returning his personal items to his pockets.[6]

---

[3] At the time the deputies initiated the traffic stop, the dispatcher reported to them that the car was properly insured and had no outstanding tickets.

[4] When the deputies activated the emergency lights on their patrol car, the video camera in the car began recording, and a copy of that video recording was admitted and played for the trial court at the hearing on the motion to suppress. Approximately five minutes into the stop, the video camera was turned off accidentally by one of the deputies. When they discovered their mistake, the officers turned the video camera on again. Consequently, only portions of the stop were recorded.

[5] Although this comment about Dominguez being nervous can be heard on the video recording of the traffic stop, the deputy who made the comment, after reviewing the video recording at the hearing on the motion to suppress, admitted that he could not recall whether Dominguez exhibited any signs of nervousness as or after he exited the car. The deputy only could recall that his hands shook when he gave his driver's license to the deputies. The video recording itself does not reveal any shaking or other obvious signs of nervousness, so the testimony of the deputy is the only evidence of nervousness in the record.

[6] The deputy who said that Dominguez was "good to go" later explained at the hearing that he did not mean that the traffic stop was over and Dominguez was free to leave. Rather, the deputy explained, he was merely indicating that Dominguez did not have any drugs on his person.

As Dominguez was retrieving his personal items, the deputies asked three times for permission to search his car, and each time Dominguez refused, telling the deputies that he did not have the time for a search. When Dominguez refused consent for the third time, the deputies informed him that they were calling a canine unit to the scene, so that a drug dog could sniff the exterior of his car.

It is undisputed that the drug dog and its handler arrived no later than ten minutes after the deputies requested the drug dog, which means that the drug dog arrived approximately fifteen minutes after the traffic stop began.[7] The drug dog sniffed the exterior of the car and alerted on the driver's side, near the front of the car, indicating the presence of drugs. The deputies then searched the car and found methamphetamine hidden in the steering column. They subsequently also discovered digital scales in the trunk.

Dominguez moved to suppress the evidence found in the search of his car, and after a hearing, the trial court denied that motion, finding that the information that the tipster had given to the deputies, the fact that Dominguez had committed a traffic violation, and his nervousness at the beginning of the traffic stop, taken together, gave the deputies sufficient reason to suspect that Dominguez was involved in illegal, drug-related activity. The trial court concluded, therefore, that detaining Dominguez until the drug dog arrived was lawful, and the court denied the motion to suppress. Following his conviction, Dominguez appeals.

Dominguez does not dispute that the deputies lawfully stopped him when he failed to properly signal a right turn. Instead, he says that the deputies unlawfully prolonged the traffic stop for the purpose of having a drug dog come to the scene and sniff his car. Given the record in this case, we are constrained to agree.

The State bears the burden of proving that the search of the car was lawful, *Thomas v. State*, 301 Ga. App. 198, 198 (687 SE2d 203) (2009), and to carry this burden, the State must show that it was lawful to detain Dominguez until the time the drug dog indicated the presence of drugs. When an officer stops a driver to investigate a traffic violation, the officer cannot continue to detain the driver after the investigation of the traffic violation is complete unless the officer has a particularized reason to suspect that the person is engaged in some other criminal activity. *Rosas v. State*, 276 Ga. App. 513, 516 (1) (b) (624 SE2d 142) (2005); *State v. Cunningham*, 246 Ga. App. 663, 665 (541 SE2d 453) (2000). Here, the State has offered no evidence

---

[7] Because the video recording stops shortly after the deputies called for the canine unit, and does not resume until after the drug dog had sniffed the car, there is no way to determine precisely how much time elapsed before the drug dog arrived.

that the deputies still were investigating the failure to properly signal a right turn — an investigation that they indisputably were entitled to conduct — when they called for a canine unit to come to the scene and detained Dominguez until it arrived. Perhaps the deputies were still conducting a traffic investigation at that time, but the record does not show it. There is no evidence, for instance, that the deputies still were awaiting information about Dominguez, the validity of his driver's license, or the registration and insurance of his car when they called for the canine unit. Compare *Bowens v. State*, 276 Ga. App. 520, 521 (623 SE2d 677) (2005) (officer still awaiting results of license and registration check when drug dog sniffed car). There is no evidence that the deputies still were inspecting the turn signal of the car or asking questions of Dominguez about it. And there is no evidence that they were writing a citation or even thinking about whether to write a citation or issue a warning during this time.[8] Compare *Byers v. State*, 272 Ga. App. 664, 665 (613 SE2d 193) (2005) (officer still writing citation when drug dog sniffed car). We must conclude, therefore, that the investigation of the failure to properly signal a right turn cannot justify the continued detention of Dominguez after the deputies called for the drug dog.[9] See *Faulkner v. State*, 256 Ga. App. 129, 130 (567 SE2d 754) (2002) (as a matter of law, a traffic stop is complete "once the tasks related to the investigation of the traffic violation and processing of the traffic citation have been accomplished"); *Cunningham*, 246 Ga. App. at 665 (original traffic stop concluded once the driver was given the citations related to the offense for which she had been stopped).

We turn, then, to consider whether the State has carried its burden to prove that the deputies had a reasonable suspicion that

---

[8] To the contrary, the record shows that the deputies learned that the car was properly registered and insured at the time they initiated the traffic stop, so they could not have been awaiting that information when they continued to detain him. And the record shows that the deputies learned at some point during the traffic stop that Dominguez had no outstanding warrants and had a valid driver's license, although the record is silent about when the deputies learned those things. Because the record is silent on that point, and because the State bears the burden of proving the lawfulness of the continued detention, we cannot find that the deputies were awaiting information about Dominguez or his driver's license when they continued to detain him after calling for the canine unit. And about writing a citation, one deputy testified that he never wrote a citation for the traffic offense, so that cannot be the reason for the continued detention. Whether he was thinking about it, or thinking about giving Dominguez a warning, while they waited for the canine unit to arrive, we do not know because the record, again, is silent.

[9] One deputy testified that the traffic stop had not concluded when he called for the drug dog, but he was not asked for, and did not give, any reasons why he still needed to detain Dominguez in connection with the traffic offense for which the deputies originally had stopped Dominguez. In fact, when asked what he was doing between the time he called for the drug dog and the time it arrived, this deputy testified that he was "[j]ust waiting on [the drug dog]."

Dominguez was involved in some criminal activity besides the traffic violation when they called for the drug dog and continued to detain Dominguez until it arrived and sniffed his car. To show that an officer had reasonable grounds upon which to temporarily detain an individual for the purpose of conducting an investigation, the State is required to prove that the officer then was aware of "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the detention." *Lindsey v. State*, 287 Ga. App. 412, 414 (651 SE2d 531) (2007) (citation and punctuation omitted). See also *Pollack v. State*, 294 Ga. App. 400, 403 (3) (670 SE2d 165) (2008). We conclude that the State has not carried its burden in this case.

The State contends, and the trial court found, that the deputies had reasonable cause to suspect that Dominguez was engaged in drug activity, given what the tipster had told the deputies and the fact that Dominguez appeared to be nervous at the beginning of the traffic stop.[10] Our precedents, however, do not support this contention. As to the tip, the deputies did not identify the tipster who provided the information or the circumstances in which the information was provided.[11] The deputies knew nothing of the credibility of the tipster, who had not dealt with the deputies before and did not regularly provide information to the Sheriff's Office. As a general rule, information from a tipster of unknown credibility does not provide reasonable grounds upon which to detain a person for investigative purposes. *Tiller v. State*, 261 Ga. App. 363, 365 (582 SE2d 536) (2003). The general rule does not always apply when the information is detailed enough that it can be corroborated, *Slocum*, 267 Ga. App. at 338, but in this case, the deputies were given only a generalized description of the car and the drug dealer who drove it, and the tipster provided no details that would have allowed the deputies to verify that the information was inherently reliable. The tip was not enough to justify the continued detention of Dominguez. See *McSwain*, 240 Ga. App. at 61-62 (anonymous tip that a light green, four-door Honda Accord, with a specific license plate number,

---

[10] The State also points to the fact that Dominguez had committed a traffic violation. We do not understand how the failure to signal a right turn suggests that one is engaged in dealing or transporting illegal drugs.

[11] We note that there is no evidence that the tipster was a "concerned citizen," as that term is used in our precedents. If the record contained such evidence, the trial court might properly have concluded that the information provided to the deputies was presumptively reliable. See *Slocum v. State*, 267 Ga. App. 337, 338 (599 SE2d 299) (2004) ("Where the information is provided to police by an informant who is either an identified interested citizen or an identified victim of a crime, there is a presumption of reliability."); *Penny v. State*, 248 Ga. App. 772, 775 (2) (b) (547 SE2d 367) (2001) ("a law-abiding concerned citizen has a built-in credibility and is deemed to be reliable").

occupied by four black males and headed northbound on I-95 from Florida to one of the Carolinas, might have some contraband in the trunk, did not support a reasonable suspicion of criminal activity). Compare *Alford v. State*, 293 Ga. App. 512, 513-514 (1) (667 SE2d 680) (2008) (sufficient basis for reasonable suspicion of criminal activity where State showed that a reliable confidential informant accurately described the vehicle the suspect would be driving "in a specific subdivision near a particular street, carrying a specific quantity of cocaine. The police conducted surveillance and observed a vehicle matching a description given by the CI with a driver who also matched the CI's description.").

The State also points, of course, to the fact that Dominguez seemed nervous when the deputies first stopped him. But even when we consider that fact alongside the vague tip the deputies had received, we cannot conclude that the deputies were aware of circumstances sufficient to create a reasonable suspicion that Dominguez was involved in other criminal activity. Recognizing that most citizens can become a little nervous when they are stopped by police officers, this Court has held before that nervousness — even when combined with other circumstances that are no less incriminating than the tip the deputies in this case received — is insufficient to justify an investigative detention.[12] See *State v. Thompson*, 256 Ga. App. 188, 189 (569 SE2d 254) (2002) (fact that defendant appeared extraordinarily nervous, became defensive when asked about marijuana, and there was a strong odor of laundry detergent or air freshener, which were often used to mask the smell of drugs, did not provide reasonable basis for suspecting criminal activity); *Payne v. State*, 244 Ga. App. 734, 735-743 (4), (5) (536 SE2d 791) (2000) (driver's nervousness combined with fact that he was driving a rental car, was traveling from Florida, and had no luggage, did not support a reasonable suspicion of drug activity); *Migliore v. State of Ga.*, 240 Ga. App. 783, 786 (525 SE2d 166) (1999) (evidence insufficient to show a reasonable basis for suspecting drug activity where defendants appeared nervous and gave police inconsistent stories about their out-of-state trip); *State v. Blair*, 239 Ga. App. 340, 341 (521 SE2d 380) (1999) (no reasonable basis for suspecting criminal

---

[12] We note that, although deputies found a large amount of cash on the person of Dominguez (about $600), there is no evidence that they discovered this cash until after the drug dog sniffed the car and they arrested Dominguez. Because large amounts of cash can be indicative of drug transactions, see, e.g., *Hight v. State*, 293 Ga. App. 254, 258-259 (5) (666 SE2d 678) (2008), we might be inclined to find that the discovery of the cash, combined with the other circumstances of this case, is sufficient to support a reasonable belief that Dominguez was involved in drug activity, if only the State had proven that the deputies were aware of the cash when they called for the drug dog and continued to detain Dominguez. The State, however, failed to make such a showing.

activity where occupants of car appeared nervous, none could produce any proof of ownership of the vehicle, and the back seat passenger was clutching a black bag).

Of all our precedents, we think *Cunningham*, supra, is the most instructive for the purposes of this case. In *Cunningham*, an officer was told that police had received a tip about a "specifically described" Caprice Classic automobile. The officer was told that the car would be traveling from the Atlanta area towards Rome on a specific highway, that it would be occupied by a white female and possibly a white male, and that the passengers in the car might be carrying methamphetamine. The original source of the tip was unknown to the officer. 246 Ga. App. at 663. The officer later saw a car of the same description on the highway that the tip had predicted. Id. After observing several traffic violations, the officer stopped the car, and as the officer approached the car, he observed a passenger reach into either the floorboard or glove box. Id. at 663-664. After the officer completed his investigation of the traffic offenses, he asked the driver for permission to search the car. The driver did not give consent and seemed nervous, so the officer retrieved a drug dog from his patrol car and walked it around the car. The drug dog indicated the presence of drugs, and when the officer searched the car, he discovered 42.2 grams of methamphetamine on the floorboard, where he earlier had seen the passenger reaching. Id. at 664. The trial court denied a motion to suppress the evidence found in the search of the car, and this Court reversed, holding that the nervousness of the driver during the traffic stop, the observation of the passenger reaching toward the floorboard, and the tip failed to provide the officer with reasonable grounds upon which to detain the driver and passenger after the investigation of the traffic offenses was complete. In so holding, we noted that the State had failed to establish that the tip was reliable. Id. at 666.

Considering the similarities between *Cunningham* and this case — and also considering that the officer in *Cunningham* had a tip that was more detailed than the tip in this case — we must conclude that the trial court erred when it found that the deputies had reasonable grounds upon which to continue to detain Dominguez after the deputies called for a drug dog. Accordingly, we must reverse the judgment of conviction below.

*Judgment reversed. Barnes, P. J., and Adams, J., concur.*

DECIDED JUNE 30, 2011.

*Kristin I. Jordan*, for appellant.

*Lee Darragh, District Attorney, Shiv Sachdeva, Assistant District Attorney*, for appellee.